Texas Alcoholic Beer Brewery v. Yoyuma거나, Texas Alcohol Beverage Craft Brewery v. ICF American When they're waiting for the table to clear and then they'll come forward. The lawyer should come forward for the next case. Mr. Trachtenberg, are you within the well of the court? He is. The appellant can come forward. You may proceed. Your time has won. Thank you, your honors. And may it please the court, Christopher Galliardo on behalf of the Texas Alcoholic Beverage Commission. Texas generally prohibits brewers from selling beer or ale to end consumers for off-premises consumption, but Section 62.122A of the Alcoholic Beverage Code carves out a small exception to this general rule for any brewer that produces no more than 225,000 barrels of malt beverage total across all of its premises, quote, wholly or partly owned. That expression, partly owned, is key to this case, but it is not defined in the code itself. But reading those words in light of the common law, statutory context, and statutory history decisively demonstrates that they encompass not only those premises over which a brewer holds a fractional fee, but also any premises over which a brewer enjoys an exclusive right of possession or use. Excuse me, sir. Are you Mr. Trachtenberg or not? I'm sorry. Are you wearing this shirt? Are you in the Hager case? Are you in the Hager case? No, sir. The Hager case. This is a Texas alcohol beverage case. OK. Yes, your honors. I'm sorry. I'm in the Hager, and I don't. Not at all, Judge Dennis. So that expression, when read in light of the common law, is statutory context, and the statutory history decisively demonstrates that a brewer partly owns any premises, not only over which it holds a fractional fee, but also any premises over which it enjoys exclusive rights of possession or use or alienation. Counterkey exclusively enjoys all three of these core property rights at each of its leased premises nationwide. It does partly owns them all. And because its barrage across all of those premises exceeds the section 62.122a statutory cap, Counterkey does not qualify for off-premises consumption in either Dallas or Austin. And so starting as we must with the text, because the code does not define the expression partly owned, the Texas Codes of Construction Act requires a court to presume that the language adopts is ordinary meeting under the common law. Counsel, though, let's look at the text. I mean, I can't speak to why the Texas legislature wouldn't have used the word leased. They could have, but they did in about 18 other places in the same code. So if we look at this particular section in context, don't we get into the assumption that they omitted it deliberately here? So two responses to that. So first, the canon of construction in pari materia and looking at consistent usage of terms across the codes and across statutes does not necessarily apply to this case because those usages of the word lease in other provisions of the code and in other Texas statutes were not passed in the same bill as the 2019 Act, which extended this exclusion to off-premises sales. So the same bill, you're talking about different amendments to the code along the way? Correct, Your Honor. But if the word lease was in the prior version of the statute in the other locations, wouldn't that strengthen the presumption that they deliberately chose their words here? So that word was never in any version of section 62.122A, Your Honor. So you're talking about the overall, what is this, the Alcoholic Beverage Code? It is, Your Honor. So the Texas legislature deliberately chose the words partly owned here because they are more expansive than just leaseholds. There are different forms of part ownership, fractional fees, any sorts of arrangements in which any of the exclusive rights of possession, use, or alienation are conferred. And so the legislature decided to cast a wider net than just the word lease would naturally give them. Counsel, it strikes me that at many levels, maybe not sufficient, the argument that we can't read owned to mean what you want it to own, that argument is a pretty good one. But the other side of the coin is it makes no sense for the legislature to have left leaseholds out. So I would interpret this likely, we don't really know, as a mistake. Now you have cited some authority that talks about legislative purpose, that runs up against clear textual language that says owned if we can't go as far as you do as what owned may mean. What is your, you do have it in your brief that basically, what is the trigger, I hate to use that word, what initiates going beyond the text under the rigid analysis that the Texas Attorney General follows on statutory interpretation? Yes, Judge Southwick. So under the Texas Code Construction Act, even in cases where the statutory language is unambiguous, the Texas Supreme Court has held in Hogan and in Rebluitt that the courts must look at both the statutory context and the statutory history of the text and not restrict itself strictly to dictionary definitions. Well here, even if I can't envision a reason why the legislature would not want to cover leaseholds, that's not our business to figure out what reason. Maybe there's some complexity to leasing the facility that the legislature, at least halfway, was considering and decided to leave it to ownership, and so it seems courts ought to be reluctant to get into trying to explain, is there any legitimate explanation? What is the relationship between what you just talked about, which is to look at the context and the purpose, and the issue of absurdity? I'm sorry, could you repeat the question? What is the relationship between going beyond the specific language and looking at the actual purpose, on the one hand, what's the relationship between that and arguing that this is absurd to read it that way? Do we need absurdity to go beyond the plain language? No, not under Texas law, Your Honor. So to invoke in Rebluitt again, and then also Texas Presbyterian Hospital, which was a case decided in 2020 by the Texas Supreme Court, absurdity is not required in order to consult the statutory context in history. It wouldn't be relevant, I suppose, to what we're doing here. We had a case not long ago where a revision to a statute made absolutely no sense, and for the next two cycles of the legislature in Mississippi, there was an effort to revise it, the revision failed. Both sides in the case tried to get the revision, revision failed. Has there been an effort to revise this? There has not. So actually, the Texas Alcoholic Beverage Code just went through the sunset revision process, which in Texas requires a consolidation and review of the entire code, and the legislature actually retained the current language in that statute. One of your briefs pointed that out, and I'm just wondering if there was a failed effort to add leasehold or leasing in this part of the statute. There is nothing in the legislative history that would suggest that, Your Honor. Proceed. And so, to be sure, despite what we currently said, not every single leasehold would necessarily confer part ownership upon the lessee. But when any lease agreement does confer upon an entity any of these three core properties, right sticks of possession, use, or alienation, the Texas Supreme Court has long held, following the precedent set down by the United States Supreme Court all the way back in 1945 in the General Motors case, that that suffices to confer part ownership. And so, because each lease agreement that Counterkey has nationwide confers not only one and not even only two of these three core property rights, but all three of them, Counterkey does partly own each of its lease premises nationwide, presumptively under the common law, as has been understood by the Texas Supreme Court. And that expansive construction of Section 62.122A is consistent with the broader context of the Code, which places strict limits on brewers to achieve two overarching goals. First, to help safeguard public health and safety and temperance. And then second, to prevent unfair competition and consolidation in the alcoholic beverage industry. Texas's three-tier system, as this Court recognized just last week, has provided the scaffolding for many of these limits since the end of Prohibition. If construed to retain the full breadth of its common law meaning, the words partly owned in Section 62.122A buttresses that three-tiered system and supports the Code's overriding public health and fair competition objectives. But if we were to follow Counterkey's position and confine part ownership to a fractional fee, Section 62.122A would render its own barrage cap meaningless and it would enable brewers of any size to engage in off-premises retail sales, thus jackhammering a breach into these walls in the three-tiered system. So Chapter 62 of the Code itself rehearses the importance of maintaining this Code's limiting regime and the strength of the three-tiered system. And nothing in Section 62.122A suggests that it's natural to read the words partly owned to undermine not only the goals of that section, not only the goals of the chapter, but the goals set forth for the entire Code in Section 1.03. In other words, the presumption that the section adopts the full breadth of the common law meaning of partly owned premises is strengthened rather than weakened by statutory context. As I mentioned, the Texas Co-Construction Act lastly requires the Court to examine the words partly owned in their statutory history to see whether they suggest that the legislature diverged from the ordinary meaning of the term partly owned. That statutory history does exactly the opposite. As we see in amendments to this section in 2017 and 2019, the state legislature closed the very type of loophole that Carnegie wishes to read back into the statute here. The number of brewers in Texas who operate more than one brewing facility is extremely small as the Court can see in production data in the record starting at page 140. And the original version of Section 62.122A enacted in 2013 reflected this industry reality when it allowed limited taproom sales for on-premises sales to end consumers and included a premises-specific barrelage cap. In the 2013 statute left little to the imagination as to its purpose, expressly stating in the preamble in Section 2 of that Act that it was meant to help small brewers in Texas. But over the next four years, some of the largest brewers in America in-vehicle themselves into the Texas taproom market by establishing brew pub chains and dominating on-premises sales. The Court presumes that a significant statutory amendment connotes a change in its meaning and in 2017, the Texas legislature amended Section 62.122A to prevent such brewer leisure demand in two different ways. First, it required the commission to aggregate a brewer's barrelage not only at individual premises, but instead across all of its premises, wholly or partly owned, directly or indirectly. And that change brought about in Section 62.122A a regime that more expressly was in conformity with the Code's overriding statutory purpose to wall off powerful manufacturers from retailers and thereby protect both the retailers themselves and end consumers. And then the second change in 2019 kept the 2017 language in place when it extended the section's scope to include sales for off-premises consumption. But Canarchy would have this Court conclude that the words partly owned suddenly turned from centuries of the three-tiered system into its shadowy saboteurs. There's no evidence in the statutory history that they actually did so. In fact, as I said, quite the opposite. And therefore, again, the presumptive common law meaning stands after a review not only of the statutory context, but of the statutory history as well. And so in summary then, the Texas Co-Construction Act requires that a court examine the words partly owned in Section 62.122A in light of their common law meaning, the statutory context, and the statutory history. All three confirm that the Commission must aggregate all barrels of brewer manufacturers at leased premises where it holds an exclusive right of possession or use or alienation. Canarchy holds all three at each of its premises nationwide and therefore does not qualify for off-premises sales. Let me ask you, how significant in the craft beer industry in Texas is this particular issue of leaseholds? I say that in part to know whether this is a significant enough case that there would be any merit to going back to state court, which sadly is where this court case started but then was removed. Any reason to certify this issue? So I see that my time has expired. May I? You're allowed to answer a question. My time hasn't expired. So go ahead. Okay. Thank you. So this court does, with some frequency, ask state courts to certify questions. In this case, there would be numerous questions that would weigh against doing that. This is not an especially close question of statutory interpretation under the common law. There's a very clear presumptive meaning. And then also— On clarity, let's say we don't agree with you on clarity. So there would still be a secondary factor under the Texas Rules of Appellate Procedure 58.1, which does allow the Texas Supreme Court to certify questions, that the parties have expended a lot of time and effort and energy already in litigating this case in the federal courts, and so judicial economy would persuade— We are reluctant to trouble the Texas Supreme Court unless necessary. So just something to evaluate, and I wanted your take on it. Thank you, counsel. Okay. Thank you, Your Honors. Your Ms. Scott.  Your Ms. Scott. May it please the court. My name is Ann Staling. I represent Canarchy Craft Brewery, maker of Deep Element Oscar Blues beers. I hope that I can do a good enough job today that the next time you're in Austin or Dallas, you'll stop by the brewery, you'll pick up some beer to go. I promise it's fresher than anything you'll get at a grocery store or a restaurant because it goes straight from the brewery to your home. What is the pronunciation of your client? Where's the emphasis? Canarchy? Yes, Your Honor. Thank you. So for the lawyers, this is a case about statutory interpretation. For my client, Canarchy, this is about having the opportunity to offer their customers the ability to buy beer to go. Now, dozens of other Texas breweries have done that exact thing in Texas for the past two years, and we believe the plain language of the statute allows Canarchy to do the same. Now, I'd like to hit four main points with my time today in addition to answering any questions you may have. First, our focus must be on the language of the statute itself, and specifically the word owned, which means to hold legal title to and does not include premises that are leased. Any other interpretation improperly rewrites the law. Counsel, let's go right there if we could. I don't mean to interrupt you from the four points, but we spent time with counsel opposite talking about this. So the state's position is that partly owned was a broader term. It was clearly used there to encompass not only fractional fee but leasehold interest as long as they met certain facets of ownership. And you heard me ask counsel about the usage of lease and other parts of the statute. He says that's not determinative of what this means. So what's your response to that, that they deliberately chose partly owned to encompass leaseholds? I was a bit confused by my friend's position that other sections of the Alcoholic Beverage Code can't be looked to in interpreting this particular provision of the Alcoholic Beverage Code. Certainly, the entire code is in par materia. Now, I think perhaps his concern— What about the history and what about the policy goals, the purpose behind the statute? So our position is that the court should not reach any type of legislative history or legislative intent or statutory history because the text of the statute is unambiguous. And that's something that all parties in the district court agreed on. I direct the court to page 4 of TABC's reply brief in which they state the statutory text is unambiguous. So we know that it's well established that legislative intent and statutory history should not be reached when the statutory text is unambiguous. That's what this court held— Five years ago, five and a half years ago, one of our now judges didn't like the opinion descended to it. But nonetheless, at the close it says— And I think this is sort of how I see this case. This is not a very reasonable way for the legislature to have consciously written this. And it seems to me to be an oversight. But that's just an opinion that may not drive the result. It is not better for courts to undertake to make laws better by reading language into them absent the necessity to do so to affect clear legislative intent, avoid an absurd or nonsensical result. Those are strong words, absurd, nonsensical. But nonsensical at one level just means it doesn't make sense. Maybe that's not one level. That is what it means. So help me with that. I asked opposing counsel the same thing. Just where do we wander from the text? Because it just doesn't make sense. Well, I disagree that it doesn't make sense. And I think something critical there is that TABC has never offered any evidence that the legislature intended to count production at leased premises, that they somehow understood the term leased—that the term owned premises to include leased premises. And I think that's what we would need here. The sense of it is why would they draw a line, same amount of product coming out of this particular address in Austin, if I understood what you were saying earlier, and why would it matter whether those producing what is in there own the property or lease the property? That's the sense of it that I'm talking about. I have a few points there. I mean, first, I have to say again that we shouldn't reach legislative intent or statutory history because the language is unambiguous. Second— I don't think my point is either intent or legislative history. It's whether it is sensical to have done it this way. At least in Mississippi law, and probably Texas too, a Mississippi judge, there's a difference between legislative purpose and legislative intent. Legislative intent, you know, when Billy Bob, representative from, well, Mississippi, from Tupelo, said in the legislature, purpose, you're looking at the overall context of the statute, and what is it trying to do? Well, frankly, Your Honor, there's just nothing in the record that tells us for certain why the legislature chose to use just the word owned and not the word owned or leased. You know, we know that in almost a dozen provisions of the code, they have used owned or leased, so I would think that they know what that means, and they intentionally chose not to use that term here. I think one rational explanation is that larger, more established brewers can afford to own their premises, while smaller breweries cannot. Obviously, purchasing a piece of property is a large investment. Small brewers perhaps can't ... This provision, which is really talking about volume, and it only applies if you're producing a significant volume. So it seems to me it's for larger breweries. Oh, I'm sorry. I didn't hear the last part of that. I don't think this particular provision would necessarily apply to the underfunded small breweries. It's talking about limiting how much is being produced. I don't believe that this provision is limiting how much can be produced. I mean, it's allowing any brewer who, together with their affiliates and subsidiaries, is producing more than 225,000 barrels on their own premises. They cannot sell beer to go, and they also can't sell for on-premises consumption either. Now, there is a 5,000 barrel cap on sales. That might be what you're referring to. So any brewer that is permitted to sell beer to go or beer for on-premises consumption can sell only up to 5,000 barrels annually, which begs the question why TABC is so focused on preventing cannery in particular to not sell beer to go. There's no indication that our interpretation would permit even one other brewer to sell beer to go. So it seems that really what TABC is ... You have that in your brief. Imagine that really wasn't an issue in district court. Aren't you just saying there's no evidence in the record one way or another on how many others operate from leaseholds? Well, I think TABC has made several comments about how this detracts from the overall mission of the code in terms of post-prohibition regulation of alcoholic beverages, and that not counting production at the lease premises would just lead to mayhem in some way or another. Now, I feel like those are very vague kind of assertions. And unfortunately, what we have here is no evidence or argument by TABC that other brewers would suddenly be allowed to sell beer to go if they actually interpreted the law as written and counted production at only the owned premises. But now back to build on Judge Southwick's point a little bit on absurdity or nonsensical results, there's section 62.14 of the code. And if I understand that, it says you either have to own your premises to be a brewery, or you have to operate in this alternating brewery proprietorship. Also, canarchy would not fit into that either. So in other words, if you read this statute to include only ownership, and then you read it in the context, if you overlay 62.14 on that, I mean, isn't that an absurd result? I disagree with TABC's interpretation of that statute. But first, everything about that alternating brewery proprietorship argument has been waived. It was never raised in the district court. It doesn't appear in the record, which is why there's— I'm going to ask it because I can look at the context of the code. Certainly. And I'll reach the merits as it now. So TABC is saying that subsection B of 62.14 requires all brewers to either own their premises or operate under an alternating brewery proprietorship. So that's not right. Subsection B of that statute doesn't use the word premises. It uses the words brewing facilities. So section 11.49 of the code defines premises as the grounds and all buildings. It's a physical location. Now, brewing facilities isn't defined by the code, but presumably means the actual brewing equipment. And that interpretation makes sense if you know what an alternating brewery proprietorship is. It's a situation where one brewer enters a contract with another brewer to manufacture their beer. It's great for startup breweries who don't want to buy their own equipment, don't want to hire their own labor. They just want to get into the business, but they don't really want anything to do with the physical part of it. So— The margins are pretty small. Sorry? The margins are pretty small. The margins are very small, Your Honor. You know, even if you do read brewing facilities to mean premises, I don't think we can. Premises is defined by the code. I think the best reading of subsection B is that it's not talking about all brewer's licensees or saying all brewer's licensees have to own their premises. I think it's just talking about brewer's licensees that are operating under an alternating brewery proprietorship. They're saying those entities are not required to own their brewing facilities. And we know that because subsection B uses the word entity instead of referring to the holder of a brewer's license or a brewer's licensee. This is the only provision in Chapter 62 that refers to them that way. I think it's limiting it to just those entities that are involved in an alternating brewery proprietorship. You know, TABC has also made the argument related to 62.14 that the inclusion of the words in fee interest in subsection E means that when the word own or owned is used alone, that it includes leases. You know, I think that's wrong for a couple reasons. You know, first, the only case they cite for that argument is City of Chicago versus Fulton. The court there was interpreting a provision of the Bankruptcy Court. The court refused to interpret one provision of the Bankruptcy Code in a way that made another provision of the Bankruptcy Code entirely superfluous and, in fact, contradictory. You know, here are the words in fee interest. They're not contradictory to the use of the word own. You know, I think it's consistent with the terms and meaning as it's used throughout the code, and the use of fee interest in this one subsection doesn't render any other provision of the code superfluous. You know, I think the better reading of subsection E is that the legislature considers own and own and free interest to be the same thing. They might have made a mistake here and just used the longer version. As far as the parade of horribles, depending on which way we go, a different parade depending which way we go. Let's say we agree with the state on this and say own includes leases. It's a big code. I looked at it, and a lot of provisions. Would it create other distortions that you identified? If we would say own as it captures other concepts and maybe more than, you know, if it captures leaseholds, I don't know what else it might capture. I'm not sure that it would. I can't identify an absurd result off the bat. I think the main issue with that is that there's just so many other provisions of the code where they've used the words or leased, and I just don't know why the legislature would use that phrase if owned. Own or lease. Or lease. Essentially, yes, Your Honor. There's a lot of surpluses. We try to avoid it, but you've got to make all this fit. And some rule of best legislative writing is probably going to be we're going to have to recognize wasn't followed in this. I don't think even TABC knows the impact of their interpretation. You know, we know from discovery that the leases, Kannerke's leases, weren't even relevant until this lawsuit was filed. Say again, what wasn't relevant? Kannerke's leases, whether they actually owned or leased their premises. So what TIBC has told us they actually do in determining whether a brewer violates the Beard to Go law is they do online research and review industry publications about acquisitions in the industry. So if you look at the investigative summaries for Deep Ellum and Oscar Blues, they don't discuss whether production is happening at owned or leased premises or whether those leases give Kannerke any stick in the bundle of property rights. They just cite two online articles about Kannerke acquiring Deep Ellum and Oscar Blues. And in those articles, it says that the total production of all Kannerke businesses is over $475,000. So they weren't doing this work before the lawsuit was filed. It's an argument that came up after the lawsuit was filed, and I don't think even they know what the implications of it are. It strikes me that, I mean talking more about Parade of Horribles, that under the TIBC's framework here, that what we're going to get into is almost a factual inquiry. And I'll ask on rebuttal also about what lease requires or what lease provides this or whether there's enough sticks in the bundle. And so basically, as they make those determinations, wouldn't that basically lead to the same result of people are going to try to basically make sure they're—I use basically too many times—too many sticks or not enough sticks? And so they just tailor their lease to avoid the very thing that they're saying will happen here if we interpret it as partly owned? Yes. I mean I think what I found very troubling is that TIBC said in their briefing that a tenant owns the property they lease if they hold even one property rights stick. So obviously we need to identify what those were. There'd have to be some kind of process to evaluate a lease. I think there would be disputes over whether a lease gives the lessee even one property rights stick. I think also if that argument is true, it's hard to imagine a lease, a lessee that doesn't own the property. I think what are the implications of that interpretation outside of this case, outside of the Alcoholic Beverage Code? Does every tenant own the premises they're leasing? That's what TIBC is claiming the common law demands. They're completely upending our understanding of the distinction between owning or leasing. They're collapsing the distinctions between the two. So on an administrative level, it's difficult, but there may be— Well, if you have a property interest, you have an ownership interest, and that's that, and the rule applies. And to Judge Southwick's point, in this particular section where we're looking at volume as the main thing, would that be preferable? I think we have to interpret the statute as the legislature intended, which is the plain language of the statute. Now I think unfortunately what TIBC has done is they've ignored ten words of the statute. They have just read out, at all premises wholly or partly owned, directly or indirectly. They're simply counting production at any premises, no matter where it is, no matter whether it is owned or leased, and that simply conflicts with the plain language of the statute. Now if the legislature disagreed with our interpretation or with the district court's judgment, they could very easily clarify this by adding two words, by adding the words or leased. Now we know the district court issued their decision in January 2021. That was the beginning of the 2021 legislative session. There were no changes proposed to this provision of the code. There were no changes adopted. I think that there's been many opportunities for the legislature to perhaps correct what TIBC has portrayed as a mistake or incorrect, and they have chosen not to do so. If it is one first identified, would you say, in relation to a legislative session? I'm sorry, would you— When was this possible mistake first identified in relation to any legislative session? So the language at issue in this case was added to the code in 2017. Now the Beardigo Amendment was added to the statute in 2019, and it took effect— —perhaps needing to be included. When would you say that was first identified issue? 2017, when these changes were adopted. Well, but you said—anyway, let me leave it at that. Why don't you continue? We're not quite connecting, but that's all right. I do want to return, unfortunately, to my four points. I see my time is running out, but— You have your brief. Yes, thank you. TIBC has claimed in its briefing to this court that the word owned should be given its common law meaning, and I'd like to correct a mischaracterization by my friend. Section 1.02 of the Alcoholic Beverage Code tells us that we should interpret the code according to the Texas Code Construction Act. Section 311.011 of the Texas Code Construction Act tells us that when words aren't defined by the statute, they should be interpreted according to the rules of grammar and common usage. It does not say common law. That's nowhere in that provision. The Texas Code Construction Act doesn't tell us to interpret terms according to the common law. It tells us to use the common usage of the term. Now, subsection B of that section says words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly. Now, TIBC has said that the word owned or partly owned does not have a technical meaning. You can see that on page 123 of the record. So what we should comply with is subsection A of 311.011 of the Code Construction Act, which tells us that this term should be interpreted according to grammar and common usage. Now, I take some disgruntlement with the fact that we're talking about a common law meaning at all. You know, TIBC focused almost exclusively on legislative intent before the district court. You can see that clearly on page 1263 of the record. That's where they say the sole issue presented is whether their interpretation is consistent with legislative intent. You know, this common law argument is, from my perspective, new on appeal. I'd ask the court to decline to consider it because it wasn't adequately presented to the district court. Now, TIBC did note in passing that property rights are like a bundle of sticks. You can see that on page 123 of the record. They cited a couple cases in their summary judgment motion about bundle of sticks, and those are Realty Trust Company, TIPS v. United States, and Ollie v. HVM. They haven't raised any of those cases to this court in the appeal. Now, the district court addressed those three cases, but it didn't really rule on the bundle of sticks argument. It didn't address it in any substantial way. You know, I think that the fact that they're even calling it something new. They're saying there's some kind of common law meaning for own. There's a common law test for ownership. You know, that was never brought up before the district court. Also, interestingly, there's no overlap in the cases cited. There's only one case that they cited to the district court for their bundle of sticks argument that they've also cited to this court. Everything else is new, and in any case, the common law meaning argument fails on the merits as well. I see my time is up, unless there's any questions. Is it in the record, either your lease of the facilities or is it lease confirmed? What do you lease? The entire, the ground, the structure, the equipment? The lease is for the building where the production is taking place. So your lease was of an empty building and you own the equipment? Would you own, so you lease the building and you own the equipment? I'm asking what is your lease? What's in the record here about canarchy? They, it's, what's in the record is that they lease the property on which their brewing is taking place. So they lease the premises. Ground lease, did you build the building and you own the building? I don't think there's information in the record about whether they built the buildings. I think it's just that they are leasing those premises for a term of years. I don't see it in this case, but it does seem to me if you have a ground lease and you build your own building and you own the equipment, this is, it puts a different light on this case. But I haven't seen it presented that way. I think it would depend on, you know, I think we need to look to the definition of premises, which is defined in the code. Partly owned, so you don't own all of the premises, but you do own the building or you do own the equipment? In that scenario, yes. If you partly own the building and the building is part of the definition of premises and if that building is under your control, then yes, you would own the premises and the production at that. Part of the premises. Yes, you own part of the premises, which is, yes, one interpretation of partly owned. The other is that, you know, you just are in some kind of business partnership and own some percentage of the premises, but yes, Your Honor. But that's not been, you would say that's not been presented to us in this case? I don't think so, no, Your Honor. All right, thank you. Thank you. And Kenarchy asks that the court affirm the district court's judgment. Thank you, Your Honors. And if I may, I'll go in rebuttal sequentially through some of the points that came up during the response. So first, our friends at Kenarchy reemphasized the opinion that they spent a lot of time on in their briefs, that there are all these other locations in the code that make a distinction between own and lease. But that's not the key issue before this court. This court must decide what the term partly leased means. And that bleeds into a— Not partly leased. I'm sorry for misspeaking, Judge Wilson. It would be easier if it was partly leased. It definitely would be, Judge Wilson. And that bleeds into a second question, and this builds off of a question that Judge Southwick asked about whether there would be any other distortions to Texas statutes if the commission's construction were to be adopted. There are four other places in Texas statutes that use the words partly owned in the finance code and in the property code. And in each of those instances, because the Texas Code Construction Act requires an analysis of context and statutory history, it is quite clear in each of those instances that the words partly owned only refer there to fractional fees. And so this specific question of statutory interpretation with regard to Section 62.122A would not have spillover effects. Now, are you saying partly owned in the entire array, all the books on the shelf that contains things promulgated by the Texas legislature, it only appears in four or three other sections on issues other than alcohol? That is correct, Your Honor. Good Westlaw search there or whatever. And then our friends at Kenarchy mentioned that analysis of the leases played no part in the commission's analysis of the facts of this case. What they didn't mention was that the commission does actually require the applicants for various leases, licenses, to submit a copy of any lease agreements that they have. And so the commission does actually have the lease agreements on file and does regularly analyze those. And then Judge Wilson asked a question about whether there would have to be a factual inquiry into every single lease and whether the lease agreements would be tailored to try to avoid possession of these individual property rights sticks. And as a dynamic measure of economic actors, that presumably would happen in the industry. But that doesn't necessarily affect the construction of the provision as it's currently written. The Texas legislature wanted to only consider partly owned premises to be any that include exclusive possession of those three core property rights sticks. And it has not extended that reasoning further into any other bundles of sticks. Our friends at Kenarchy also suggested that the commission's construction of the statute would read ten words out of the statute. But it misunderstands the canon of surplusage, which the Supreme Court of the United States reminds us in the city of Chicago v. Fulton allows exceptions and should be very narrowly construed because state legislatures oftentimes reiterate themselves within the statutory text itself in order to emphasize their meaning or to eliminate any possibility of misconstruction in the courts. And that is the case here. But I just go back, Counsel, to that argument seems to cut both ways. It would be so simple for them to have reiterated themselves if they just added or leased. And they didn't do it. And I'm sitting here thinking about my own time in the Mississippi legislature. And if it's anything like it is in Texas, the alcohol statutes got a lot of attention. It doesn't mean everybody was an ace drafts person when they put the statutes together. But whenever we had amendments come through, whenever we considered any of those things, it was a pretty deliberate process. And in Texas, I mean, that's neither here nor there, I guess. The Mississippi legislature has nothing to do with this. But I'm just sitting here thinking this wasn't an obscure statute that sat there since the end of Prohibition. It was amended. It was amended again. And there are deliberate efforts that strike me as evidenced in the statute of the legislature's intent to, first, let craft breweries sell on premises. Second, let people buy stuff and take it out as long as it's under a certain level. We went through a lot of the similar things in the Mississippi legislature while I was there around this same time frame. And it was very deliberate, and it was very considered. And so I don't know. I mean, this is just commentary, I guess, but it strikes me as very difficult to follow your suggested statutory interpretation when all they had to do was add least. And it may have been a mistake or an oversight, but we're left with the statute as it's written. So, Your Honor, I will answer this quickly since my time has expired. But if the state legislature had chosen to use the word least, that would have been a much narrower application of that exception, where, as I discussed during the opening statement, the concept of port ownership is much more expensive than just leaseholds. And so since the state legislature wanted to have Section 62.122a have as narrow an applicability as possible, it wanted to fold in not only any sort of port ownership that can be found in leaseholds. But partly owned is not a term that's used anywhere else in the Alcoholic Beverage Code? It is not, Your Honor. And if the court doesn't have any further questions, I thank you for your time. Thank you.